The opinion of the Court was delivered by
Fenner, J.
This important controversy, involving interests of vast magnitude, turns upon the construction of certain legislative acts creating and defining the corporate rights of plaintiff. The City contends that the corporate existence of plaintiff, together with all its rights and franchises, to operate the railroad known by its name, expire in 1883, under the terms of its original charter, passed on February 9th, 1833, which provided that “ the duration of this charter ‘is limited to fifty years.” The plaintiff contends, on the other hand, that, for the purposes of operating said railroad, its corporate existence was extended for twenty-five years longer, viz: to 1908, by virtue of the 22d Section of an Act of 1835, amending said original charter, which provided, “ that the railroad and all its fixtures, shall become the property of the State at the expiration of seventy-five years from the date of its charter.”
*433 We say, by virtue of tliis Section, because, though other legislative acts and municipal ordinances are invoiced in support of plaintiff’s claim, they all hinge upon plaintiff’s interpretation of this Section.
The State, acting simply through her Attorney General, without any special legislative direction, intervenes, and substantially joins the plaintiff in the case. We deem it proper to remark that, while the action of the Attorney General, in intervening herein for the protection of the State’s interests, as he views them, is highly proper and commendable, and while we are greatly indebted to him for his very able presentation of the rights of the State under the law, yet his intervention raises no new or different issues, and leaves us under the duty of deciding the case precisely as we should have done had the intervention not been filed.
We mean to say that the State is not here by any authority competent to bind her by any assent to the claims of plaintiff, as presently urged, in virtue of which it might be said, (and is said in the Attorney General’s brief) that the charter of plaintiff, being a contract between the plaintiff and the State, to which they are the only parties, and these parties agreeing as to the scope and meaning of said contract, the City, as a third person, has no right to question such construction. Such an assent could only be given by legislative action, and the very question which we have to determine is whether that assent has been so given. This question must be settled by an examination of the legislative acts on the subject, and not, certainly, by the allegations of this intervention.
We think the learned Attorney General will admit the correctness of this view, and that the contrary position assumed in his brief, will not be insisted on.
The primary and fundamental question in the case is, what is meant by, and included in the terms, “ the railroad and all its fixtures,” as used in the 22d Section of the Act of 1835. If, as contended by the City, that expression did not cover the railroad between New Orleans and Carrollton, but referred exclusively to the railroad between Carrollton and Bayou Sara, contemplated and provided for by the Act of 1835, there is, of course, an end to the pretensions of both the State and the Company, which are founded exclusively on the contrary interpretation of that phrase.
The purposes of our exegesis will be subserved by' collating and bringing together as closely as possible, shorn of extraneous matter, all the provisions and expressions of the several legislative acts which immediately bear on the question.
The Act approved February 9,1833, provided that certain persons therein named, with their associates and successors, “are hereby created *434 a body corporate, under the name of the New Orleans & Carrollton Railroad Company," etc., (Sec. 1); fixed the amount and mode of payment of its capital, (Sec. 2); and providedfor the administration of its affairs by directors, (Sec. 3).
The 4th Section provided, “ that the said corporation is hereby invested with all the powers necessary for the construction and repair of a railroad, " therein described, and being the present railroad from New Orleans to Carrollton.
The 5th Section provided for the conventional acquisition, or forced expropriation of lands necessary to the road, with the proviso, “ that the said railroad shall not pass in any part of the City or its incorporated suburbs, without the permission of the Mayor and City Council of New Orleans.”
The 6th Section conferred power to place on the railroad such kinds and variety of rolling-stock as it may deem necessary, and regulated rates of charges, and provided that “the said road, with adits works, improvements and profits, and all the machinery of transportation used on said road, are hereby vested in said Company, incoiporated by this Act, and their successors; and the shares of the capital stock of said Company shall be exempt from the imposition of any tax or burthen of this State, during the space offime years."
Section 8 provided, “ that the duration of this charter is limited to fifty years. That if said railroad shall not be commenced in one year from the passage of this Aet, and shall not be in operation in three years therefrom, then this Act shall be null and void."
The other Sections have no bearing.
The Aet of 1835, is entitled, “ An Act to amend the Act to incorporate the New Orleans & Carrollton Railroad Company.”
With the exception of Section six, which is evidently out of its proper place in the Act, the first ten Sections are exclusively concerned with provisions: fertile enlargement and mode of subscription and payment of the shares of capital stock; for the constitution and regulation of certain banking privileges conferred upon the corporation, and for other matters mainly pertinent to those particular privileges, and which have little if any bearing on the questions now at issue.
The Sections which affect the present issue are Nos. 11,12,13,14, 15, 19, 20, 22 and 23.
Section 11 provides, “that during the space of thirty years from the passage of this Act, the Company is hereby invested with the exclusive right and privilege of constructing- and using a railroad, which said railroad shall commence at the termination of the railroad described in the original Aet of Incorporation of said Company, and constitute a continuation thereof, and shall run to the town of Bayou Sara, etc. * * * And *435 the road authorised by this Act, with its lateral roads, shall consist of as many sets of tracks, etc. * * * And if the said road shall not be commenced in two years from the opening of thp books of subscription for the said additional capital stock, or shall not be finished and completed within six years from such commencement, then this Act and all the extended powers, rights and privileges herein granted to said Company shall be utterly null and void, saving and reserving, however, to said Company, the rights, privileges and provisions of their charter, as heretofore existing.
Section 12: “That, in case said railroad, thus to be constructed, in continuation of said originally contemplated railroad, shall run upon any public road, the said Company shall be bound to construct a new public road, * * * and shall be bound to fence both sides of said railroad whenever it crosses private lands, etc.”
Section 13 provides for expropriation proceedings, and ends with the declaration, “ that all proceedings hereafter to be instituted for the expropriation of lands neeessary for the railroad contemplated in the original act of incorporation, shall be conducted in like manner, etc.”
Section 14: “ That whenever it shall be necessary for the construction of said railroad to cross any stream or highway, being betwixt the boundaries prescribed by this Act for the commencement and termination of the railroad hereinabove described, it shall be lawful for the said Company to construct their said railroad across or upon the same, etc.”
Section 15: “ That the said Company shall have the power to place on the railroad to be constructéd under this Aet, all machines, wagons, etc. ”
Section 19 : “ That the provisions and penalties prescribed in the eleventh Section of the original charter, shall apply to the continuation of said railroad herein contemplated, etc.”
Section 20: “ That the capital stoch of said Company, and the said railroad, with all its continuations, works, imx>rovements, etc., shall be exempt from the imposition of any tax or burthen of this State, during the term of twenty-six years, provided said railroad be completed and go into operation.”
Section 22: “ That the railroad and dll its fixtures shall beeome the property of the State, at the expiration of seventy-five years from the date of its charter, as a compensation in part of the privileges herein granted^
Section 6 : “ That in case said Company do not build said road in six years, said banh shall pay to the State a bonus of twenty thousand dollars, annually, during the existence of the charter, to be appropriated to the public school fund of the State.”
It is obvious that this Section cannot be reconciled with that portion of Section 11, which provides that in case of failure to *436 begin the road in two years and complete it in six years, “ then this Act, and all the extended powers, rights and privileges, herein granted to said Company, shall be utterly null and void,” on any other theory except that the forfeiture thus denounced, notwithstanding the broadness of the terms, was only intended to embrace the extended rights, powers and privileges referring to the road, and not to the banking privileges; since» otherwise, “the bank” could not have continued to exist, and could not, therefore, have been required to pay the penalty imposed in the 6th Section.
We have not thought it necessary to quote that portion of the 23d Section, applying the provisions of the original charter “ to the extended rights, powers and constitution of said Company,” because it seems to us utterly unimportant, and the arguments founded on the use of the word constitution, impress us as too wire-drawn to be seriously considered.
On March 6th, 1836, more than three years after the passage of the Act of 1833, and, therefore, it must be presumed, after the completion of the original railroad, another Act was passed, containing the following provisions:
Section 1. “ That the 6th Section of the Act of 1835, and such portion of the 11th Section thereof, as imposes a forfeiture of charter and other penalties for not commencing the railroad in two years from the period, therein defined, and not completing the same within six years from such commencement, are hereby repealed; provided, however, that in lieu of the aforesaid forfeiture and penalty, the Company shall pay to the State” the sum of $100,000, in annual instalments, as therein provided. '
Section 4. “ Be it further enacted, etc., Thatso much of the eleventh Section of said Act as grants to said Company the exclusive privilege of building a railroad to commence at the termination of the railroad described in the original Act of incorporation of said Company, to the Town of Bayou Sara, be, and the same shall continue in force; provided, that within ten years from and after the passage of this Act, one-fourth part, at least, of said railroad, be built and completed, and, in case such part be not built and completed, as aforesaid, then exclusive privileges shall be ipso facto null and void.”
Section 10. “ That the foregoing bonus shall be considered a full consideration for any right on the part of the State to tax the Carrollton Railroad Company, from which said Company shall be exempt during the space of thirty years.”
The remaining Sections of the Act refer to the banking department, and have no bearing.
We have thus presented a fair and, for our purposes, a complete *437 sketch of t-lie incongruous, obscure and inconsistent legislation under which the present controversy has arisen.
A fact which impresses one as remarkable, at the outset, is that the Carrollton Railroad Company, which has initiated this litigation, should be contending with such zeal to enlarge the construction of the 22d Section of the Act of 1835, which purports to do nothing except to impose upon the Company a burden, and to exact a penalty as a compensation for privileges, part of which it never exercised, none of which ever enured to its advantage, and all of which have long since been abandoned. This anomaly is explained when we see that the Company deduces, from this burden, implied privileges in its own favor, largely exeeedingin value the burden itself, and thus seeks to convert the penalty into a reward.
We advert to this, not for the purpose of criticising the action of the Company, but for the purpose of rebutting the claim that the ordinary rules of strict construction which are applied to corporate charters, are to be reversed in this instance, because the clause to be construed is one in favor of the sovereign.
No one would dispute the right of the Company to give its property to the State in 1908, or at any earlier period. What the plaintiff is really claiming is the right to operate its railroad through the streets of New Orleans, for a period of twenty-five years from 1883; and the question to be determined is whether this valuable right has been conferred upon her by her charter, either expressly or by legal implication, because, under a particular construction of legislative acts, the State would derive certain pecuniary advantages, furnishes, in our judgment, no reason why we should depart from those general rules which are universally applied in the exposition of statutes. The State is the fountain of justice, and when mere rights of property are asserted in her favor, she subjects herself to the dominion of those laws which she has herself established as the proper standard by which similar rights, when claimed by her citizens, are regulated and determined. Her dignity and justice requires that, when'a question is presented to her courts, as to the extent to which she has delegated a part of her sovereign power, and conferred upon individuals peculiar privileges not shared by the rest of her children, such question should be determined without consideration of any more pecuniary advantage to the State. We, at least, shall determine this question precisely as if the reversion of property claimed under this Statute had been stipulated in favor of any individual, instead of the State.
It seems very clear that the Acts of 1833 and 1835, provide for the construction of two distinct railroads, the first between New Orleans and Carrollton, to be commenced in one year, and completed in three *438 years, from February 9th, 1833, under penalty of nullity of the privilege; the second, between Carrollton and Bayou Sara, tobe commenced in two years from a date after April 1st, 1835, and to be completed in six years after said commencement, under penalty of like nullity of said privilege, but without affecting the former i>rivilege.
The Act of 1835 industriously distinguishes between these two roads, and, whenever it has occasion to refer to the first road, describes it specifically as “ the railroad described in the original Act of incorporation,” or as “the railroad contemplated in the original charter,” or in equivalent terms, whereas, with equally careful discrimination, it describes the last as a “ railroad ” commencing at Carrollton and ending at Bayou Sara, and refers to it repeatedly as “the railroad authorized by this Act,” “ the railroad hereinabove described,” “ the railroad to be constructed under this Act,” “ the said railroad,” etc.
This fundamental idea' of two distinct roads is carried forward, even more unequivocally, into the Act of 1836, passed after the completion of the original road. No one can dispute that the terms, “the railroad,” and “ a railroad,” as used in the 1 st and 4th Sections of that Act, refer exclusively to the railroad from Carrollton to Bayou Sara, and not at all to the then completed New Orleans & Carrollton Railroad, which is not alluded to anywhere in the Act.
Fixing firmly in the mind this fact of the perfect distinctness of these two railroads, as referred to in the Acts, it is next to be observed that the original railroad is not created, regulated, modified, or in any manner controlled by the Act of 1835, but stands entirely upon the Act of 1833, which, so far as the road is concerned, (except in the one unimportant particular of subsequent expropriations) is absolutely unaffected by the Act of 1835, and is to continue in full force, even if the latter Act should be stricken out of existence by failure to comply with its conditions. On the other hand, the only railroad which forms the subject of the Act of 1835, which is created, defined, regulated and controlled by it, is the railroad from Carrollton to Bayou Sara.
It seems difficult to understand how these two railroads, which have been kept so perfectly distinct in all the provisions of this Act, down to the 20th and 22d Sections, are there suddenly to lose their sejiarate identities, and to be fused into one, under the general expression, “the railroad.”
The 20th Section exempts “the capital stock of the Company and the said railroad, with all its continuations, works, fixtures, etc.,” from taxation during twenty-six years, “ provided said railroad be completed and go into operation.”
The proviso seems to remove all doubt as to the railroad referred to. Bear in mind, there were two railroads, unequivocally distinct as to the *439 terms witliin which they were to be completed. The first was then under active construction, and within ten months of completion. The other was the railroad provided for in the Act, to be built under and in accordance with the Act, to be completed within the term fixed therein, and the construction of which was, no doubt, the prime consideration of the exemption. Can it be doubted that this was the railroad whose completion and going into operation were referred to in the proviso, and consequently the only railroad referred to in the Section ? It strains construction beyond all reasonable limits to obliterate the perfect distinctness established by the prior provisions of this Act, and of the Act of 1833, between these two roads witlireference to their respective completion, or to hold that when the Statute here says, “ provided said railroad be completed,” it means “ provided both said railroads be completed.” Although never a step was taken towards the building of the road from Carrollton to Bayou Sara, it is nevertheless the fact that the railroad between New Orleans and Carrollton was actually completed and went into operation, and was and remained a completed and operated railroad. But it was not the railroad contemplated in the proviso. We are satisfied that proviso referred to one, and not to both of said roads, and that the one so referred to, was unquestionably the road from Carrollton to Bayou Sara.
It may here be said that the word “ continuations,” used in the Section, evidently refers to the various branches of the road authorized in the Act. This construction is inevitable. If those branches were not referred to as continuations, how is the use of the plural to be explained ? If they were referred to, the necessities of our construction are fully satisfied.
If any one will refer to the summary of the provisions of the Act of 1835, and will strike from Section 11, heretofore given, the words: “ and constitute a continuation thereof,” and from Section 12, the words : “ in continuation of said originally contemplated railroad,” and will then read the whole, not a shadow of doubt will rest upon his mind that, if the Statute had omitted these phrases, the words, “ the railroad,” as used in the 20th and 22d Sections, could not possibly be held to refer to anything except the rpad to be constructed under that Act. Upon the use of the apparently innocent phrases referred to, the plaintiff really founds his entire exposition of the Statute; because, the like phrase used in Section 19 of the Act is manifestly descriptive, and being used in contradistinction to the “ original railroad,” serves to preserve, instead of to confound, the distinctness of the two roads.
Prom so slight a cause, he deduces the following prodigious consequences :
1. The abrogation of that clause of Section 6, of the Act of 1833, *440 which provided an exemption of the capital stock from taxation for five years, as the sole inducement for the building of the original road, and the substitution, therefor, of a sweeping exemption of capital stock, railroad, rolling stock, and all possible property, for twenty-six years,
2. The absolute repeal of the prior portion of the 6th Section of Act of 1833, which vested the road and everything connected with it, in the Company and its successors, and substantially transferring the whole property to the State, subject to a mere usufruct by the Company.
3. The repeal of Section 8, of the original charter, limiting the duration of the charter of the Company to fifty years, and extending the same to the period of seventy-five years.
Surely so slender a thread was never required to support so ponderous a weight.
These deductions, in each and every part thereof, encounter the stubborn opposition of all recognized canons of construction.
1. They enlarge an exemption from taxation. Statutes conferring particular exemptions from general burthens, which, according to sound principles, should be borne by all alike, are to be regarded with a jealous eye, and are never to be extended beyond the limits to which the strictest intepretation of the legislative act confines it in the particular case. Sedgwick on Stat. Const., pp. 296-7 ; Cooley on Taxation, p. 146.
2. They impair and destroy the vested right of property in and to their track, works, rolling stock, etc., which, by the 6th Section of the Act of 1833, had been expressly conferred upon the Company and its successors, so far as the road from New Orleans to Carrollton is concerned, such divestiture is in derogation of natural and private rights, and can never be raised by implication, or extended beyond the clear and necessary meaning of the express terms of the Statute. 1 Potter’s Dwarris, p. 49 ; Sedgwick Stat. Const, p. 302.
3. They extend, by implication, the existence of the corporation twenty-five years beyond the term to which its duration was expressly limited in its charter.
“ Grants of the franchise to be a corporation,” says the judicious Cooley, “ which confer upon a few persons what cannot be shared by the many, and which, though supposed to be made on public grounds, are, nevertheless, .of great value to the corporators, and are, therefore, sought with avidity, are never to be extended by construction beyond the plain terms in which they are conferred. No rule is better settled than that charters of incorporation are to be strictly construed against the corporators. The just presumption in every such case is that the State has granted, in express terms, all that it designed to grant at all.”
*441 He quotes with approval the nervous language of Chief Justice Black, of Pennsylvania:
“ When a State means to clothe a corporate body with a portion of her own sovereignty, and to disarm herself to that extent of the power that belongs to her, it is so easy to say so, that we will never believeit to be meant when it is not said. In the construction of a charter, to be indoubt is to be resolved; and every resolution which springs from doubt, is against the corporation.” Cooley Const. L., p. 394; Penn. R. R. Co. vs. Canal Com’rs., 21 Penn. St. 22.
The Supreme Court of the United States, in terms equally emphatic, has said:
“ Every reasonable doubt is to be resolved (adversely to the corporation). Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this Court.” Fertilizing Co. vs. Hyde Park, 97 U. S. p. 666.
The experience of this people and the spirit of our present organic law, do not encourage us to modify, or depart from, these well-settled principles.
4. They repeal, by implication, three distinct and positive provisions of the Act of 1833, which have been already indicated. We say by implication, because. Section 23, of the Act of 1835, which repeals all former enactments, “ so far as they may be inconsistent with the provisions of the present Act,” is the merest surplusage, and means and effects nothing which would not have been equally effected, had the clause been entirely omitted. In the language of our Civil Code, a repeal is implied, “ when the new' law contains provisions contrary to, or irreconcilable with those of a former law.”
We scarcely know of any subject upon which Courts are so unanimous as in their strong disfavor of repeals by implication.
The principle is, that “ laws are presumed to be passed with deliberation, and with full knowlege of all existing ones on the same subject, and it is, therefore, but reasonable to conclude, that the legislature, in passing a Statute, did not intend to abrogate any prior law relating to the same subject matter, unless the repugnancy between the two is irreconcilable.” Sedgwick Stat. Const, pp. 106,98.
If possible to reconcile the Acts by any fair or reasonable construction, it must be done. 1 Black, 459; 11 Wall. 356, 652; 41 Mo. 16; 37 Geo. 3.97; 44 Ill. 198.
The rule applicable here is, that the general terms of a subsequent Statute, “shall not be considered as effecting the mere particular or posi *442 tive previous provisions, unless it is absolutely necessary to give the latter Act such construction, in order that its words shall have any meaning at all." Sedgwick, p. 98.
In the present case, we have shown that the general words used in Sections 20 and 22 of the Act of 1835, may readily, and even most materially, bear a meaning, which leaves in full force the “ particular and positive previous provisions,” of the Act of 1833. Even if this meaning wore less natural- and probable, how should we avoid adopting it ?
See, on this subject, the numerous cases quoted in Hennen, Laws, III. (a.)
5. Our Civil Code, Art. 17, provides :
“ Laws in pari materia, or upon the same subject matter, must be construed with a reference to each other. What is clear in one Statute, may be called in aid to explain what is doubtful in another.”
“What is doubtful” in tho instant ease, is whether the term, “the railroad,” as used in the 20th and 22d Sections of the Act of 1835, refers only to the road authorized by, and to be constructed under that Act, or embraces also, the road from New Orleans to Carrollton, fully provided for by the prior Act of 1833. Referring to the last named Act, we find clear and unambiguous provisions fixing the status of the original road as to exemption from taxation, as to the proprietary rights of the Company therein, and as to the term for which the right was given to operate the same. These provisions exhausted those subjects, so far as the original road was concerned, and further legislation thereon was not necessary nor appropriate, unless unequivocally designed to alter the status thus fixed. On the other hand, it was natural to expect that, in authorizing the construction of a new and additional road, provisions on these subjects, with reference to such road, would be .made. Aided by “ what is clear” in the Act of 1833, we “ explain what is doubtful” in the Act of 1835, and reach the conclusion that Sections 20 and 22 refer to “the railroad” authorized by that Act.
Reverting now to the expressions establishing the new road as a “ continuation ” of the original road, and which, as wo have said, lie at the root of plaintiff’s exposition of the Statute, we are of opinion that they are not entitled to the weight which lias been given them. Had they been omitted, the fact would have remained the same, that the new road, if built, would necessarily have been a continuation of the old. It was this purely conditional fact which was present to the legislative mind when it used these natural expressions. They were not significant of an immediate and unconditional consolidation of the two enterprises into one, in such sense as to absorb the identity of *443 each, and to constitute, at once, a single "railroad” from New Orleans to Bayou Sara, and thus to support an inference that the words, “ the railroad,” when used without qualification, could be held to refer to such a consolidated unit. It is apparent that the Statute nowhere refers to such a unified road, but, on the contrary, continually refers to two roads authorized by different Acts, subject to different regulations and conditions, to be completed at different terms. We, therefore, necessarily infer, that when the Statute uses the term, “ the railroad,” in the singular, it alludes to one of said roads and not to both of them, nor to a compound road including both, for the existence of which idea in the legislative mind, the prior legislative expressions afford no warrant.
We adhere to the sound principle that abstract rules of construction are not to be allowed to defeat the real intent of the law-giver, the discovery of which is, after all, the cardinal purpose of all construction. But when, as in the instant case, the obscurity of the legislative expression is such as to leave a real, substantial doubt as to the true meaning, such rules are legitimately invoiced to solve that doubt, and particularly rules which are founded on considerations of public policy, as is the case with those which we have here referred to.
There is, perhaps, no subject upon which human minds, equally intelligent and candid, are capable of so wide and irreconcilable differences of opinion as in the construction of really ambiguous writings, whether Statutes or contracts, especially when lengthy and complicated. This is illustrated by the unmeasured, and doubtless sincere confidence, with which either party in this case, asserts the absolute correctness of his own view and the entire absurdity of his' adversary’s; and, still more, by the fact that we have reached a conclusion directly opposed to that enforced by the very able opinion of the Judge of the Court a qua. These, differences only serve to establish, beyond controversy, that the question is doubtful; and, this conceded, the rules of construction, here invoked, solve, and settle it.
We do not profess, in this opinion, to have specifically answered all the various arguments advanced, in support of their theory, by counsel for plaintiff and the State, but they have been attentively considered, and honestly weighed.
We are unable to attach any force whatever to the alleged contemporaneous construction placed upon these legislative acts by the plaintiff corporation, in support of which certain fragmentary portions of its corporate records*have been introduced in evidence.
It would be strange, indeed, if the extent of the franchises, privileges or even burthens imposed or conferred upon a corporation were to be measured, not by the terms of the legislative act, but by the claims *444 which the corporation might choose to set up thereunder. So far as the direct privileges are concerned, the absurdity of the proposition is self-evident ; and so far as tho burthon is concerned, when that is made the basis for a claim of incidental privileges outweighing itself in value, the absurdity is hardly less apparent. But for these incidental advantages, it is not likely that these so-called contemporaneous constructions would over have omerged from the dusty archives of the corpotion; and if tlifey had, they are not of a character to operate even as estoppels against the Company. But such constructions are of no weight in the interpretation of contracts, unless they are mutual, that is, made by both parties or by one with the express or implied assent of the other. C. C. 1956.
We find no subsequent legislative action of the State, which, in our judgment, asserts, or, in any manner, assents to, the construction now contended for. An attentive examination of the subsequent legislative acts referred to by counsel, convinces us so clearly that they do not have the effect contended for, that we deem more particular discussion of them superfluous; and only advert to them because they seem to be seriously insisted on by counsel.
The 7th Section of the Act of 1842, applies to all banks which have constructed any public work, whether the work so constructed is to revert to the State or not, and, therefore, neither the Act itself, nor the acceptance of its provisions by the Company, have any effect in determining to which category this corporation belonged.
The Act of 1867 simply authorizes tho corporation, with the consent of its stockholders, to consolidate their interests with those of “ certain parties, lessees of said road,” and to scale the existing stock, and to “ issue such additional stock as may represent tire value of the improvements placed on said railroad by said lessees.”
The Act was passed sixteen years before the expiration of the charter. Nothing therein indicates that the legislature knew, or concerned itself about the term for which the lease had been granted, nor was it a matter about which the legislature had any need to concern itself. To deduce therefrom a ratification of the Company’s assumed right to lease the road beyond the term of its charter, would be the very lunacy of judicial law-making.
Of one thing we are assured, that the plaintiff Company has no right to consider itself aggrieved by our decision. ' The privileges claimed by it are mere incidents of a burthen said to have been imposed. They are not claimed as independent rights, but merely as necessary to enable it to discharge an onerous duty. Relieved, as she now is, of this duty, every claim of incidental right vanishes.
So far as the State is concerned, it is not believed that she could *445 desire, in order to secure a paltry pecuniary benefit, to interfere with those plenary powers of administration and dominion over her public streets, which she has conferred with so liberal hand upon the City of New Orleans. It has been within her power, to establish railroads upon the streets of the City, and to exact compensation therefor, regardless of the wish or the will of the City, and if she had desired to receive pecuniary benefit at the expense of her favored creatures, she might have filled her coffers by such means.
This has never been her policy; and, in these very Acts, she was careful to subject the right of this corporation to enter the municipal limits, entirely to the consent of the City. Those limits now embrace the entire railroad of this Company, and we are satisfied the State would not desire that this road should be operated within them, in defiance of the will of the City, unless in execution of a clear and valid contract right so to do.
In conclusion, we would say that, had wo adopted plaintiff’s construction of the 22d Section of the Act of 1835, as to the more extended meaning of the word “ railroad,” we should still have found it impossible to deduce therefrom, an extension of the corporate existence, for any purpose whatever, beyond the term expresssly limited in the charter.
In the Act of 1835, incorporating the Atchafalaya Railroad & Banking Company, we find two Sections, one limiting the duration of the corporation to 50 years, and the other providing “ that at the expiration of 75 years” from the end of the charter, “the property of said railroad, etc., shall be vested in the State.”
The inclusion of these two provisions in the same Statute, negatives the idea that the legislature of that year considered them inconsistent, and, therefore, rebuts the inference that the 22d Section of the Act of 1835, was intended to repeal the limitation of plaintiff’s corporate existence in the Act of 1833. If, then, they co-exist, how are they to be reconciled? The argument in favor of corporate life is this: that the State, having stipulated a reversion to herself in 1908, it would be absurd to suppose that the right of the corporation to operate the road should cease in 1883, because that would render the reversion utterly valueless.
But this absurdity vanishes, the moment it is considered that the State, as the sovereign, held, in its own hands, the power, at any time, to extend, at will, the corporate existence.
The State was not willing to accept the reversion as a consideration for an immediate extension of the charter, but reserved to herself the right of determining that question in the future, according to her interests.
*446 The Company was willing to grant the reversion, without an immediate extension of charter, in the hope and expectation that the resulting interest of the State would be a sufficient inducement for the granting of such extension thereafter.
Thus, the two provisions are perfectly reconciled.
The State has never seen fit to grant such extension.
We have carefully considered Section 7 of the Act of 1842, and are satisfied it only relieved pro tanto from the forfeiture of charter previously incurred, and was only intended to continue the corporate existence during the period originally fixed in the charter.
The contrary interpretation contended for encounters all the difficulties which lie in the way of every corporation which seeks to claim an extension of corporate life from mere doubtful legislative expressions. Such pretensions cannot be thus supported; but only by proof so clear, “ that the probation bear no hinge or loop to hang a doubt on.”
From this denial of corporate continuance would follow other consequences fatal to the obscure claims urged in behalf of the corporators.
The original consent of the City of New Orleans, that this road might enter her limits, was given in 1833, at a time when there was no question that the duration of the plaintiff’s charter extended only to 1883, and on familiar principles, only operated during the life of the corporation.
Subsequent assents are specially limited to the terms of the charter. As the legislative authority to construct the road within the City limits was entirely contingent upon the City’s consent, it follows that all right to operate it, on behalf of any person, or for any purpose, expired with the charter, so far as the original City limits below Felicity Road are concerned.
The. record furnishes us no evidence as to the consents given by any other municipal corporation existing on the route, which were equally required by law, and would be subject to the same limitation.
As to the expropriation of private lands, we are not advised of the terms and extent thereof. But we find in the record a voluntary cession by numerous proprietors of the right of way, passed in 1833, which limits the right ceded to the term of the charter, and provides that, if not extended, at the termination thereof, the property ceded should become a public highway. As to this part of the route, the Company’s right of way would clearly expire with its charter, and it would then become a public highway, now a street of the City of New Orleans, unincumbered by any adverse rights of the Company or its corporators.
Whether other portions of the route expropriated under the Act of *447 1833,oi‘ used by tlie consent of municipal corporations given under that Act, would occupy a different position, we cannot now say, but, under no circumstances, could tlie corporators, after tlie expiration of the charter, have any right of way except over fragmentary portions of the route.
In a controversy involving the interests, and in its solution, disappointing the. hopes of so many persons, we have felt justified in going beyond the points necessary, under our view, to the decision, in order to show that, under no possible theory that we could adopt, could the rights asserted in their favor be sustained.
All the resources of legal acumen, powers of discrimination, ingenious hermeneutics and varied learning have been exhausted in the attempt to maintain their claims.
The stubborn fact remains that they have no foundation except in implications, more or less violent, from obscure and equivocal legislative expressions, which have doubtless come from interested assumption of a given meaning, to possess a clearness of import to the parties concerned, that does not and cannot be felt by the impartial judicial mind. Not a single direct, positive, unambiguous grant of the power to operate this road beyond the limit of its original charter, has been, or can be quoted from any legislative act.
Charters and other Acts conferring powers and privileges upon corporations, though ostensibly mere ordinary acts of legislation, are usually prepared by the parties interested, and by them submitted for legislative approval. This is one, among many reasons, why they are always so strictly construed. Pierce on Railroads, p. 491.
They are assumed to have been prepared with care and forethought, and to embody clearly all the rights and privileges which it was supposed the legislature would have been willing to grant. To permit such privileges to be cloaked and covered up under ambiguous and equivocal expressions, not distinctly presenting the subject of their extent and propriety to the legislative'mind, would he to expose the legislature to deception, and to enable parties, by artful duplicity of language, to claim and enjoy privileges which, it may he, the lawmaking power did not intend to grant, and would have refused, had they been directly and clearly asked.
Against the possibility of tlie success of sucb devices, the judiciary sets its face like flint.
It is, therefore, ordered, adjudged and decreed, that the judgment appealed from he annulled, avoided and reversed, and that plaintiff’s demand he rejected, and the injunction dissolved, and the intervention of the State dismissed, at their proper cost in both Courts.